Filed 7/30/15  In re A.G. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.G., a Person Coming Under the Juvenile Court Law. | H041178 (Santa Clara County Super. Ct. No. 3-14-JV40591 A&B) |
| THE PEOPLE, Plaintiff and Respondent, v. A.G., Defendant and Appellant. | |

Multiple juvenile wardship petitions have been filed against A.G.  (Welf. & Inst. Code, § 602, subd. (a).)[1]  This appeal is from the June 23, 2014 disposition.  (See §§ 725, subd. (b), 800, subd. (a).)  A.G. challenges the juvenile court's finding as to his capacity to commit robbery (Pen. Code, § 26, subd. One), the crime alleged in the first petition, and the sufficiency of the evidence to support the court's finding that he is culpable for that robbery as an aider and abettor.

We find no error and affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

# I

## *Procedural History*

A juvenile wardship petition, filed March 21, 2014, (petition A) (No. JV40591A) alleged that, on or about March 19, 2014, A.G. [2] committed second degree robbery by taking "personal property, necklace, telephone, and shoes," in the possession of Anthony by means of force or fear. (See Pen. Code, §§ 211-212.5, subd. (c).)

A second petition, filed April 8, 2014, (petition B) (No. JV40591B) alleged that, on or about October 21, 2013, A.G. violated Penal Code section 626.10, subdivision (a), by bringing and possessing a "folding knife with a locking blade upon the grounds of, and within, Piedmont Middle School, a public and private school providing instruction in kindergarten and grades one to twelve."

On June 6, 2014, the juvenile court held a contested jurisdiction hearing on petition A. Anthony did not want to testify and someone from the Victim Witness program was called to assist him. The court ordered Anthony, with his mother at his side, to testify. After all the evidence, the court found the petition A's allegations true beyond a reasonable doubt and found A.G. to be a child described by section 602.

On June 9, 2014, A.G. filed a waiver of rights form in which he admitted violating Penal Code section 626.10, subdivision (a), (bringing or possessing specified weapons on school grounds) as alleged in petition B. At the jurisdiction hearing on that petition, the juvenile court accepted the waiver. As to the capacity issue under Penal Code section 26, which arose from the fact that A.G. was 13 years old at the time of the incident, A.G. admitted that he knew it was wrong to take a knife to school because he was endangering the children around him. The court found that A.G. knew and appreciated the wrongfulness of his act. It sustained petition B.

---

[2] All references to A.G. are to appellant. The alleged victim has the same initials but we refer to him as (Anthony).

2

At the disposition hearing on petitions A and B on June 23, 2014, the juvenile court declared A.G. a ward of the court, required him to serve 45 actual days on the Electronic Monitoring Program, returned him to parental custody under the probation officer's supervision, and imposed certain probation conditions.

A notice of appeal from the June 23, 2014 disposition order was filed on June 25, 2014.

Subsequently, on July 14, 2014, a notice of probation violation under section 777 (section 777 notice) was filed. It alleged that "minor was failed from the Electronic Monitoring Program (EMP) on July 9, 2014, when he cut off the EMP bracelet and absconded from Probations [*sic*] supervision, with his whereabouts remaining unknown." Subsequently, the section 777 notice was dismissed without prejudice.

On July 16, 2014, another juvenile wardship petition was filed (No. JV40591D). It alleged that, on or about July 14, 2014, A.G. committed second degree burglary (Pen. Code, §§ 459-460, subd. (b)) by entering "a building, Miguel's Cabinet Shop, located at 1133 S. 6th Street, San Jose, CA, with the intent to commit theft." A.G. filed a waiver of rights form in which he admitted the allegation. The appellate record in this case does not contain any record of the disposition on that petition.

II

*Evidence on Petition A*

Anthony testified that he was 13 years old and attending Piedmont Middle School on March 19, 2014. In the afternoon after school that day, Anthony was attacked and robbed.

On March 19, 2014, Anthony had just finished school and was waiting in front of the school when A.L., whom he knew from Piedmont Middle School, walked up to him. A.L. asked Anthony if he "banged Blood," which Anthony indicated was a type of gang. As far as Anthony understood, A.L. was asking whether he claimed Blood.

3

Anthony answered no. A.L. said that he "[didn't] care." Anthony asked, "Well, why you here[?]" A.L. did not answer the question.

Another "kid" joined them and asked Anthony the same question, impliedly if he "banged Blood," and Anthony again replied no. S. joined them. The unidentified "kid" pulled out a single blade of a pair of scissors and announced that they were going to the bridge, which was close to the school and near a 7-Eleven. They first walked to the 7-Eleven, which was across the street from the middle school. At the 7-Eleven, A.G. joined them.

A.L. commented that A.G. said that Anthony "threw up" the Blood sign at him. Anthony replied, "I don't know what you're talking about." Anthony pointed at A.G. and said, "Did I throw up a Blood sign at you?" A.G. answered yes. Anthony kept saying, "I'm not a Blood, I don't know what you guys are talking about."

An unidentified "kid" said to A.G., "Help us jump this fool." A.G. walked with Anthony and the others from the 7-Eleven to the bridge, about 50 yards. At the bridge, Anthony was assaulted.

S. punched Anthony in the stomach. The wind was knocked out of Anthony and he fell. Anthony tried to get up but he was held down and they kept punching him. He could not tell who was punching him. While face down, Anthony felt a kick or a stomp to his back.

Anthony rolled over and an unidentified "kid" reached into his pockets and took his iPhone 5c cell phone. At the hearing, Anthony testified that A.L. took Anthony's black cross necklace and, while that was happening, A.G. was sitting on a rock. A.L. and the unidentified "kid" threatened to really hurt Anthony if he did not give them the password. Anthony was afraid for his life and gave them his password.

A.L. took Anthony's slippers from him while Anthony was still on his back on the ground. Anthony testified that, at this point, he did not see A.G. around but he agreed that his focus was on A.L. He saw an unidentified "kid" leave. A.L. said, "F[uck] Scraps

4

and F[uck] Bloods." A.L. warned, "Watch out, if you say again you're a Blood, just see what happens when we come back." A.L. left.

Anthony went directly back to Piedmont Middle School to get help. There, he spoke with Parrish, the school's assistant principal. Anthony subsequently spoke with police.

Anthony told Parrish or a police officer that all of his attackers claim Norte or Crip. Anthony testified at the hearing that A.L. claims Norte, which is the same gang as "northerner."

At the hearing, Anthony testified that A.G. did not do much. Anthony admitted, however, that he was afraid that bad things might happen if he talked and Anthony was afraid of being attacked again. He acknowledged that, as a result of the attack, he was "pretty traumatized," "shaky," and "afraid for [his] life." He was "very afraid" of the attackers because he heard rumors at school that they were going to come back and finish the job.

Anthony admitted that right after the incident, when the events were fresh in his mind, he spoke to Parrish and told her the truth. He knew A.G. by name and told Parrish that A.G. was involved in the assault. Parish spoke with the 911 dispatcher in front of Anthony.

Anthony spoke to a police officer after the incident and was trying to tell the truth. Anthony spoke to Officer Rodriquez three times. Anthony spoke to the officer for the first time right after the 911 call. He spoke to the officer later that evening by telephone. They spoke a third time the next day when the officer returned to the school and interviewed him.

At the hearing, Anthony initially denied telling the police officer that A.G. asked him, "Do you bang for the Bloods[?]" After reviewing the police report, however, Anthony acknowledged that he had told the police officer that A.G. directly asked him that question. Anthony testified, however, that he had not told the truth to the officer in

5

that instance. Anthony conceded that he wanted to get A.G. in trouble because he was mad at A.G. Anthony acknowledged that he had a grudge against A.G. because A.G. was there when he was getting attacked.

The day after the incident, Anthony spoke with a probation officer by telephone; he was trying to tell the probation officer the truth. He did not remember telling the probation officer that A.G. took his necklace. Anthony denied telling the probation officer that A.G. took his necklace.

Deann Parrish testified that, on March 19, 2014, Anthony was a student at Piedmont Middle School but A.G. was not, at that time, a student at Piedmont Middle School. On that date, Parrish received a call from the school secretary that Anthony had been beaten up and he was back at school. Parrish, who was not on campus, returned to the school.

Parrish instructed the secretary to get 911 on the phone and began taking care of and talking to Anthony. Anthony had a big red mark on his head and a welt was forming; he was given ice for his injury. Anthony was shaken and upset.

The 911 call was transferred to Parrish, who conveyed Anthony's answers to the 911 operator's questions. Anthony named A.L. and A.G. as two of five attackers, all Hispanic male juveniles believed to be Norte[ñ]os. Parrish told the 911 operator that A.L. and A.G. had been expelled from Piedmont Middle School because of knives. One of the attackers whom Anthony did not know had a scissor blade. They took a black iPhone from Anthony. The incident occurred under the bridge next to the school at Penitencia Creek and Piedmont.

Anthony told Parrish that he had been assaulted and robbed. Anthony told her that A.G. had hit him. He had been forced to go under the bridge. Under the bridge, they asked "who do you bang, grabbed [his] necklace and pulled it off his neck, and hit him in the head and stole [his] slippers and then ran off." Anthony had just had foot surgery. Anthony had said that he had been beaten up by A.G. and singled him out as the leader.

6

Anthony also identified A.L. and mentioned S., which was the name Anthony heard used for one of the attackers.

Parrish provided photos of A.G., A.L., and S. to the police. Those three suspects were students at Stonegate on March 19, 2014 but Anthony knew A.G. and A.L. from when they had been students at Piedmont Middle School. S. had been at Piedmont Middle School the previous year. The parties stipulated that Stonegate Continuation School is located at 2605 Gassmann Drive, San Jose.

Mike Nascimento, a San Jose police officer, testified that, at about 3:35 p.m. on March 19, 2014, he responded to Piedmont Middle School after a robbery dispatch call. He contacted A.G. on the sidewalk across the street from the school. A.G. was about 200 yards away from the bridge.

Manuel Rodriquez, a San Jose police officer, testified that he responded to Piedmont Middle School on March 19, 2014. Officer Rodriquez spoke to Anthony. The officer spoke to Anthony later that night to clarify some details and again spoke to Anthony in the school office on March 20, 2014.

During their initial conversation, which Officer Rodriquez understood occurred within an hour of the alleged incident, Anthony told Officer Rodriquez that he was approached by five suspects. An unknown suspect "pulled out a half a pair of scissors." They walked to an underpass in the area of Piedmont and Penitencia Creek Roads. Anthony did not mention 7-Eleven at that time.

Anthony told Officer Rodriquez that A.G. asked Anthony if he "banged Blood." After Anthony "denied that he banged," Anthony was "accused of throwing up the B sign" by A.G. Anthony "denied throwing up the B sign" and then S. "punched him in the stomach." Anthony fell to the ground and, as he was trying to get up, an "unknown suspect" "stomped on his back [and] told him to stay down."

Anthony was turned over and A.L. took Anthony's cross, which was made from twined thread, off his neck and an unknown suspect reached into Anthony's pocket and

7

took out his cell phone. A.L. and an unknown suspect made Anthony give up his password. An unknown suspect told Anthony to "stay on the ground or they would bust him up again." Someone told him that "if he says it again, meaning that he is a Blood, that he just needs to wait to see what would happen if they have to come back." A.L. took Anthony's slippers and left.

During the in-person interview the following day, Anthony told Officer Rodriquez that he was confronted outside the school by A.L., he was shown a single scissor blade by someone he did not know, and he was told to walk to the 7-Eleven. A.L. and the unknown suspect walked Anthony over to 7-Eleven, where they met up with A.G. and another unknown suspect. Anthony said that A.L. asked, "What's up" and "you bang Blood?" In front of A.G., an unknown suspect said, "Help us jump this fool." A.L. and S. were also present. Anthony was told to walk to the bridge and the entire group, including A.G., walked to the bridge together.

During the initial interview with Officer Rodriquez, Anthony did not specially mention that A.G. physically attacked or struck him in any way. During the officer's follow-up interview the next day, Anthony did not specifically say that A.G. physically assaulted him.

III

*Petition A*

A. *Penal Code Section 26, Subdivision One*

1. *Background*

Penal Code section 26 provides in pertinent part: "All persons are capable of committing crimes except those belonging to the following classes: [¶] One—Children under the age of 14, in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness." Thus, children 14 years and older come with the general presumption regarding capacity to commit crime. "Penal Code section 26 articulates a presumption that a minor under the age of 14 is incapable of

8

committing a crime. (Pen.Code, § 26, subd. One.) To defeat the presumption, the People must show by 'clear proof' that at the time the minor committed the charged act, he or she knew of its wrongfulness." (*In re Manuel L.* (1994) 7 Cal.4th 229, 231-232 (*Manuel L.*).)

The California Supreme Court has held that the phrase "clear proof" in Penal Code section 26, subdivision One, refers to proof by clear and convincing evidence and not proof beyond a reasonable doubt. (*Manuel L.*, *supra*, 7 Cal.4th at p. 232.) "Hence, for a section 602 petition to be sustained, the People must prove by clear and convincing evidence that the minor appreciated the wrongfulness of the charged conduct at the time it was committed." (*Ibid*.)

The juvenile court found that the People had met their burden under Penal Code section 26, subdivision One, by proof "beyond a reasonable doubt."

2. *Apprendi v. New Jersey's Impact on Manuel L.*

In *Manuel L.*, the California Supreme Court stated: "While it is true that in *In re Gladys R.* [(1970)] 1 Cal.3d 855, we held Penal Code section 26 applicable to proceedings under section 602, so that a finding under Penal Code section 26 is a prerequisite to an adjudication of wardship under section 602, we did not convert capacity, as defined in [Penal Code] section 26, into an element of the offense. The issue of the juvenile's capacity remains, as historically it has been, subject to a distinct standard of proof." (*Manuel L.*, *supra*, 7 Cal.4th at p. 236.) It concluded: "[C]riminal capacity is not an element of the offense and thus is not the type of fact of which *In re Winship* requires proof beyond a reasonable doubt. Rather, it is akin to the question of sanity, which due process does not require the prosecution to prove beyond a reasonable doubt. (*Leland v. Oregon* (1951) 343 U.S. 790, 793-799; see *Patterson v. New York* [1977] 432 U.S. [197,] 205.) In *Leland v. Oregon*, *supra*, 343 U.S. 790, the United States Supreme Court recognized that 'the basic decisions between guilt and innocence and between criminal responsibility and legal insanity' are different in kind (*id*. at p. 800.), holding

9

that to place the burden on the defendant to prove his insanity at time of the offense does not relieve the prosecution of proving 'all the necessary elements of guilt.'  (*Id.* at p. 795.)  By parity of reasoning, due process is satisfied by Penal Code section 26's requirement that the presumption of a minor's incapacity be rebutted by clear and convincing evidence."  (*Id.* at p. 238.)

Minor asserts that *Manuel L.*, *supra*, 7 Cal.4th 229 is no longer good law because the decision has been abrogated by *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), which was decided after *Manuel L..*  In *Apprendi*, the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[3]  (*Id.* at p. 490.)  "Lower courts may decide questions of first impression, including the effect that subsequent events, such as a United States Supreme Court decision, have on decisions from a higher [state] court, including [the California Supreme Court]."  (*People v. Johnson* (2012) 53 Cal.4th 519, 528.)

In this case, the court found the People had rebutted the presumption that A.G. was incapable of committing the crime because of his age by proof *beyond a reasonable doubt* that A.G. knew the wrongfulness of his acts.  Since the juvenile court applied this higher standard of proof, we need not resolve whether *Apprendi* abrogated *Manuel L.*'s determination that the standard of proof imposed upon the People to rebut the rebuttable presumption of a minor's incapacity under Penal Code section 26, subdivision One, is merely clear and convincing evidence.  That controversy is an abstract question that

---

[3] "[T]he 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. [Citations.]  In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *withou*t any additional findings."  (*Blakely v. Washington* (2004) 542 U.S. 296, 303-304.)

requires no resolution in this case.  (See *Paul v. Milk Depots, Inc.* (1964) 62 Cal.2d 129, 132.)

*3.  Sufficiency of the Evidence to Show Minor's Knowledge of Wrongfulness*

A.G. maintains that the prosecution failed to overcome the presumption of incapacity established by Penal Code section 26.  "A trier of fact making a section 26 determination does not attempt to read the mind of the minor, but considers the objective attendant circumstances of the crime—such as its preparation, the method of its commission, and its concealment—to determine whether the minor understood the wrongfulness of his or her conduct.  [Citation.]  'Reliance on circumstantial evidence is often inevitable when, as here, the issue is a state of mind such as knowledge.'  [Citation.]"  (*People v. Lewis* (2001) 26 Cal.4th 334, 379.)

"On appeal, we must review the whole record in the light most favorable to the judgment and affirm the trial court's findings that the minor understood the wrongfulness of his conduct if they are supported by 'substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof. [Citations.]' (*In re Jerry M.* [(1997)] 59 Cal.App.4th [289,] 298; see also *In re Marven C.* (1995) 33 Cal.App.4th 482, 486-487; *In re Cindy E.* (1978) 83 Cal.App.3d 393, 398-399.)  The trier of fact, not the appellate court, must be convinced of the minor's guilt, and if the circumstances and reasonable inferences justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment.  (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.)"  (*In re James B.* (2003) 109 Cal.App.4th 862, 872.)

During closing argument, A.G.'s counsel acknowledged that A.G. was 13 years of age at the time of the incident.  A.G.'s date of birth is stated on the petition and it appears that A.G. was actually about 13 years and nine months old when the assault and robbery were committed.  "[A] minor's 'age is a basic and important consideration [citation], and,

11

as recognized by the common law, it is only reasonable to expect that generally the older a child gets and the closer [he] approaches the age of 14, the more likely it is that [he] appreciates the wrongfulness of [his] acts.' [Citation.]" (*People v. Lewis*, *supra*, 26 Cal.4th at p. 378.)

In this case, the victim was forced to go under the bridge under threat of being stabbed with a scissor blade. At the 7-Eleven, A.G. was asked to help "jump this fool" from which it may be reasonably inferred that A.G. knew the plan was to attack Anthony. A.G. joined the group of males who took Anthony under the bridge, inferably a more secluded location than the 7-Eleven that reduced the risk of detection. It may be inferred that A.G. fled the scene sometime after Anthony was assaulted and his necklace was taken. A.G. and the other identified juveniles in the group of attackers were students at a continuation school and apparently claimed gang affiliation. A.G. had been expelled from Piedmont Middle School. A.G. was almost 14 years old.

Viewing the record in the light most favorable to the juvenile court's determination, there is substantial evidence to support its determination that the People had rebutted the presumption of Penal Code section 26, subdivision One, and shown that, at the time the charged act was committed, A.G. knew its wrongfulness.

B. *Sufficiency of the Evidence to Support the Jurisdiction Finding*

At the jurisdiction hearing, the People's theory was that the evidence showed beyond a reasonable doubt that A.G. aided and abetted the robbery. The juvenile court determined that the People had satisfied the burden of proving beyond a reasonable doubt that A.G. was responsible for the robbery as an aider and abettor. A.G. argues on appeal that the evidence is insufficient to show that he was either directly involved in robbing Anthony or he aided and abetted the robbery of Anthony.[4]

---

[4] We disagree with A.G.'s contention, raised for the first time in his reply brief, that the People forfeited the natural and probable consequences theory of aider and abettor criminal liability.

12

"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) "When the definition of the offense includes the intent to do some act or achieve some consequence beyond the *actus reus* of the crime (see *People v. Hood* (1969) 1 Cal.3d 444, 456-457), the aider and abettor must share the specific intent of the perpetrator. . . . [A]n aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime. [Citations.]" (*Id*. at p. 560.) "[A]n act that 'has the effect of giving aid and encouragement' and 'is done with knowledge of the criminal purpose of the person aided, *may* indicate that the actor intended to assist in fulfillment of the known criminal purpose,' and *may* therefore serve as the basis for 'an inference' regarding an alleged aider and abettor's intent. (*People v. Beeman* (1984) 35 Cal.3d 547, 559, italics added.)" (*People v. Manibusan* (2013) 58 Cal.4th 40, 94.)

In this case, it was reasonable to infer that A.G. knew that one or more other juveniles intended to assault Anthony since A.G. was asked to "help jump this fool." It was also reasonable to infer that, with knowledge of that unlawful purpose, A.G. joined the group taking Anthony from the 7-Eleven to the bridge, an inferably more secluded location where the assault took place. It was reasonable to draw the further inference that, by being a part of that group, A.G. intended to, and by his conduct did in fact, aid, encourage, promote, or facilitate the commission of that assault. (See *People v. Beeman*, *supra*, 35 Cal.3d at p. 561.) The show of force in numbers contributed to the intimidation of Anthony who acquiesced to being taken to the bridge. "[A] person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts. [Citation.]" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)

13

"An aider and abettor is guilty not only of the intended, or target, crime but also of any other crime a principal in the target crime actually commits (the nontarget crime) that is a natural and probable consequence of the target crime.  [Citations.]  'Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault.'  (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)"  (*People v. Smith* (2014) 60 Cal.4th 603, 611.)  "A consequence that is *reasonably foreseeable* is a natural and probable consequence under this doctrine."  (*Ibid.*)

"A nontarget offense is a 'natural and probable consequence' of the target offense if, judged objectively, the additional offense was reasonably foreseeable.  ([*People v.*] *Medina* [(2009)] 46 Cal.4th [913,] 920.)  The inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense.  (*Ibid.*)  Rather, liability ' "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." '  (*Ibid.*)"  (*People v. Chiu* (2014) 59 Cal.4th 155, 161-162.)  The natural and probable consequences rule "extends accomplice liability to the perpetrator's reasonably foreseeable crimes regardless of whether the defendant personally harbored the specific intent required for commission of the charged, nontarget offense.  (See *People v. McCoy*, *supra*, 25 Cal.4th at p. 1118, fn. 1; *People v. Prettyman* (1996) 14 Cal.4th 248, 261.)"  (*People v. Pearson* (2012) 53 Cal.4th 306, 321.)

This case had gang overtones.  The evidence supported inferences that Anthony was targeted for assault because Anthony allegedly displayed a Blood gang sign to A.G., which A.G. himself confirmed, and the perpetrators, some of whom Anthony believed were gang members, were seeking to scare and intimidate Anthony by the use of force.  The court as trier of fact could reasonably conclude that, under all the circumstances, a reasonable person in A.G.'s position would have or should have known that the nontarget robbery of Anthony, involving the taking of personal belongings, was a reasonably

foreseeable consequence of the assault aided and abetted.  Consequently, the evidence supported the juvenile court's determination that A.G. was culpable as an aider and abettor.

## DISPOSITION

The June 23, 2014 disposition is affirmed.

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.


_____

WALSH, J.[*]